Thank you, Your Honor. May it please the Court, my name is David Wilson. I'm appearing today on behalf of the petitioner in this matter, Pauline Sagoe. The last case you remarked at the end of the argument, that was a complex legal question with straightforward facts. I would say this is the opposite. It's interesting that they're juxtaposed against each other. The question is rather simple. The question is, do the government meet its burden of proving that the parties, when they married in 2000, entered a marriage with a primary purpose of evading immigration law? Let me make it simple for a way that you'll find less comforting. It's simple because you have to get around the adverse credibility findings. And how do you do that? Well, in some respects, Your Honor, that's true. On the other hand, the adverse credibility findings would only matter as much as if it was actually the petitioner's burden of proof. So to the extent that there are adverse credibility findings in this matter, it goes to whether the government still met its burden with the evidence in the record. This is not your typical immigration case where, in fact, the petitioner comes before the court and says, well, I still proved up my application for relief. Because of the operation of law and because of the passing of the U.S. citizen, then the burden shifted to the government. So the adverse credibility finding includes finding credible Opong and the DHA, Squira, I guess is her name. Sure. It's not just that your client was not credible. It's that those two witnesses were Opong by third hand, so to speak, were credible. And all those credibility rulings are treated the same under our precedence, aren't they? They would, Your Honor, and so I'll cut to the chase and address the first question. The board in its order gives credit to the DHS agent actually procuring many of the third party statements. It does so on page three of the order, and it does so again on page four of the order. That is just factually incorrect. It's a misstatement of the record to say that the DHS agent went out and secured these third party statements. The person who went out and secured these statements was Ms. Abraham. She started sending letters in February of 2004 and kept sending them all the way to the end of the year. In a letter that goes back to, I believe it's May 31st, she indicates, I will do anything necessary to protect this estate. She then follows up on July 13th, 2004 and starts furnishing records. Which credibility findings are you challenging? First, I'm challenging that the government made a determination as to credibility, said these statements aren't credible if they're coming from the sister-in-law as much as they are coming from my client. They said that we will not consider direct evidence. Wait a minute. The sister-in-law was found to be non-credible. Exactly, but yet she. The plaintiff was found to be non-credible. The DHS agent was found to be credible and the testimony about what Opung said, which was really quite devastating because it was contemporaneous with the marriage. It was the only pre-marriage evidence other than the letter that Samuels drafted and never sent. I know you spin out a nice conspiracy of later events, but I think I can't figure out how you get around those credibility findings. I think maybe where we're not connecting, Your Honor, is that the board at the outset credited the wrong person for procuring the documents that supposedly washed through the badge of Officer Swera. It says in its order the DHS procured these statements. That is just not supported by the record. Ms. Abraham provided them to the government. She went out and got them. Wait a minute. Who talked to Opung by phone? The initial affidavit came from Ms. Abraham. Then a phone conversation occurred on December 17, 2004, between Officer Swera and Opung. That is true. That's what was found to be credible. I think that the testimony from the officer was found to be credible, and she found Opung to be credible. So essentially the court relied on Officer Swera's determination of credibility. It adopted it. Anne said in the court's view Opung had no axe to grind, so to speak. That was part of the court's rationale for crediting what he said to the agent. That's true, Your Honor. What's wrong with that is the question. Why should that be an impermissible finding? Well, I think, Your Honor, then we'll get to the heart of the matter, which is the credibility of the officer herself. When she's testifying, she's testifying as to the record that had been developed over the course of several years. This proceeding didn't start until 2011. In preparing for this hearing, I went back and looked carefully at her testimony because I was still bothered by the statements of the board. There was an exchange between the attorney representing Ms. Segoe at the time and Officer Swera, and he asked her essentially what was the motivation when it comes to finding motivation. Did you question any of these individuals as far as why are you providing, and I think he meant to say they are providing, me with these information? And she responded, the probate issue happened way after the interview, that I was not aware of that stuff when I looked into my investigation. I still wasn't even aware of it during the whole entire investigation part. She's saying this in 2011 when the record shows she had been on alert of the probate issues for years. She further then testifies a few moments later in the transcript, now are you aware that Ms. Abrams was sued for defamation in state court? And she says no, no. On its face, her testimony is not credible just by her own words. Her veracity is now in doubt. She doesn't recall that the federal government was involved in participating in a state court case, had been identified as expert witnesses in that state court case, had talked openly with amongst officers, again through redacted email so we can't figure out exactly who, about the fact that they're trying to help in the civil law case the person they deem a tipster. The opposing counsel in the defamation case specifically outlines in her letter to the U.S. Attorney's Office the involvement of DHS in the case. What did Swera do that affected the probate litigation? How did she affirmatively assist the conspiracy you're painting? Well, the agency showed up on March 14, 2006 to serve the notice of intent to deny that Officer Swera drafted. The only reason they weren't able to serve her that day is because the trial got postponed. That was the start of the defamation trial. Defamation trial, that's not the probate matter. No, there are actually multiple matters, Your Honor. This case is convoluted. I mean, it's inherently implausible that a DHS agent with, I'm sure, plenty of things to do, would go out of her way to conspire to help a sister-in-law who's not credible anyway get some money. I don't know how then you otherwise explain the email communication saying that we are trying to help this individual, this unnamed person, in a civil lawsuit. This is the document uncovered in the belated FOIA appeal? Correct. And then you have the… Belated response. Correct. And then you have, on top of that, the correspondence from the trial counsel, the defense counsel in the defamation case acknowledging exactly who she's talking to and what the plan of action was relative to the federal government. And so then for her to come testify… What plan of action? The plan was that Officer Palmer Dinnick, another officer in this case, was going to appear and assert personally the notice of intent to deny. In other words, kind of the precursor to these proceedings. And the whole point of doing that was to affect the civil law case. And so when asked about the overlap… What if it's relevant to the case? What if there's a discovery request outstanding? Then that would be relevant too then in the context of the removal proceedings when the counsel's asking for communications or information relative to that that the government would disclose it. Because at that point… Now you're talking about this case. Correct. In the current context, counsel at the time was inquiring about the relationship between Ms. Abraham and the government. He had made motions for production of documentation or information that was turned away. And he, in fact, was told, go file a FOIA appeal. And so he did. But it took years to find up, show up. And then this information, even when produced, has redacted information. That's not before us. I don't understand how it affects the credibility of the agent's testimony regarding what she learned from OPUM years earlier. It affects because she is the filter who was actually asking the questions. And then the questions that were asked of him… It can't be overlooked, by the way, that the petitioner… By the way, which she is who now? Officer Suera. Officer Suera. Of course she is. She's asking the questions. Right. But she's not asking for any clarifications. She's doing an immigration investigation. Well, she's not doing it alone, Your Honor. She's doing it with Ms. Abraham's guided assistance as the personal administrator of the estate. Where do I go on the record to confirm that? There are several letters in which she… Testify. Testimony that confirms that. There are Ms. Abraham's own letters. Her own letters indicate as much. The July 13th letter suggests… It says, in fact, she's confirmed that she had ordered the personnel records. Why would she be confirming it to a federal officer unless they had communicated about the need for them? Then in the July 20th letter, she wrote, now that I have submitted immigration's requested information, but there's no log of communication between Ms. Abraham. There's no record that the officer is talking to her. So then later when she's asked that question during trial, it says, no, I don't know anything about it. She's just not telling the truth. So if you're going to assess credibility, the officer should at least be held to the standard of telling the truth about a simple thing when the entire body of evidence that the government secured came from the administrator of the estate, which happened to be so unmotivated, with $300,000 potentially to lose. Now, you represented your client before the immigration judge, is that right? I did not. I am appellate counsel. I'm looking at this order of the immigration judge on behalf of the respondent. I'm sorry. That is incorrect, Your Honor. On remand, I did. On remand? This case is actually the second time before this court. Was there somebody representing her when the agent testified before the immigration judge? There was, and that's what I was referring to as trial counsel. That's someone else. So trial counsel had a chance to cross-examine the agent and then to argue that the agent, because of the influence of Ms. Abraham, probably, I think your theory is, asked Opong leading questions or whatever to try to fit the preconceived notion that the agent and Ms. Abraham wanted to solidify. Isn't that your theory more or less? That appears to be what happened in the record of proceedings. My question though is, didn't the immigration judge have a chance to assess whether that's what happened or whether, in fact, Opong was interviewed in a way that produced reliable information? The record, as I'm reading it, doesn't suggest that the immigration judge at the time of making her initial ruling, or her second ruling in this case, considered Mr. Opong's testimony itself, but she considered it in conjunction with the other written statements that had been offered. So is Mr. Opong's testimony the linchpin in this case? I don't think that would be enough to carry the day because his testimony by itself is incredibly vague. Part of your argument is the BIA improperly relied only on post-marriage facts. No, no, my argument is... That's what this refutes. Your Honor, excuse me, my argument is not that. My argument, in fact, is that not only did the BIA look over evidence that was supportive of Ms. Segoe's credibility. You asked about credibility. Actually, I'll go to that point. The medical records themselves, for example, the government goes a great length to make great hay about one reference to him claiming single in April of 2002. They don't even acknowledge that 33 days later, during another medical appointment, he checks married. The other thing that's also at issue is Ms. Segoe's credibility is being attacked, and part of it is her portrayal of what her marriage consisted of. And her marriage consisted of being married to a man who actually, according to his medical records, drank. She said she fled a man who drank, and that was dismissed. It was not pulled out very well at trial, and I'll have to acknowledge that, but it is in the medical records. It plainly states that he drank 4 to 5 cognacs a day, 2 to 3 beers, and a bottle of wine daily for 20 years. That's his own representation to his doctor in 2002. During the midst of this marriage, when she's fleeing and coming back, fleeing and coming back. Remind me, did he work during that time? Did he work? He did. He did. Although, to that end, Your Honor, his finances also were in tatters, and he soon after filed bankruptcy. So work, I don't know how reliably he worked, but nonetheless he was employed. I see I have about 25 seconds left, so I'll try to save it for the one last question I can get at. Thank you. Ms. Kory. May it please the Court, Jennifer Kory on behalf of Attorney General Sessions. I'm going to get off of my argument here for a second to address the issue of Officer Skwera and her credibility. I think opposing counsel totally glossed over the fact that Officer Skwera, during her testimony multiple times, stated that she did, and she admits that she talked to Margaret, the sister of Mr. Lessor, many times, but that she relied on the information that was given to Margaret, given by Margaret, only to the extent that it was also corroborated by objective evidence. Also, her entire investigation was not based on the information that Margaret supplied. That's completely untrue. In her testimony, she said, I did a lot of investigation on this case. I mean, we looked at addresses, previous addresses. We ran a national comprehensive report, which indicates financial, as far as credit cards, or any links to addresses, automobiles. Margaret did supply a lot of information, as far as friends and relatives, and contacting them, but I contacted them to get information, which is the 551 of the record. As far, and to the extent that she would have any bias, I don't understand that to me is a complete conspiracy theory that is not actually backed up by any of the information, except this one email, which I don't concede has anything, shows any sort of bias. This one email between two officers, who are unnamed, and just says that Margaret requested that they speed up the issuance of the NOID. Officer Squira's investigation, just as she said, was really based on a whole lot of objective evidence, and that's objective evidence that we've laid out in my brief, and the record is voluminous, so I'm not going to get into all of it, but I would say that there's three really important areas where it shows a lack of a bona fide marriage. A lack of shared residence, a lack of shared assets, and a lack of shared lifestyle. And all three of those things really back up what Mr. Oppong testified to, and corroborate his version of events, which he also gave an affidavit to. As far as shared residence, there's no evidence that she really ever lived with, that Ms. Segoe ever lived with Mr. Lessor. There is evidence that when she first came into the country, she lived with a family friend, or who was rumored to be her boyfriend, but she says family friend. So she stayed with him in New York when she first came to the United States. Then as of June, when Mr. Lessor wrote the letter that he never sent, he, in that letter, claimed that she still refused to move in with him, and was living with a cousin at that point. Past that, we have formal leases executed for two years and five months of what was a three-year and five-month marriage. I put six addresses in my brief, but I found seven addresses in a P.O. box for Ms. Segoe during the time of their marriage, and a lot of neighbors saying that they never knew that he was married and that he lived alone. As far as shared lifestyle, I agree. Opposing counsel said one of Mr. Lessor's medical documents listed him as married, but on his registration, he listed himself as separated, and Margaret, his sister, is of next of kin. In one of the reports, it says, patient is now requesting transfer to a transitional facility as he lives alone. It is a back and forth on whether he lists himself as married or single, but I think that speaks to him trying to help her out, and trying to have it on record sometimes that there's a marriage there, so that when they went to immigration during their interview, they could have some documentation to show that. Then also, as far as shared lifestyle is more concerned, she opened a credit line with this family friend, and she bought a car with him. As far as shared assets are concerned, there's just multiple important places where he does not list Ms. Segoe at all. Most notably, on his mortgage, on his homestead, on his life insurance, which he does list himself as married, but then again, lists his beneficiary as his sister, and then a contingent beneficiary as his nephew. The few places where they do have shared finances came later in their marriage when they were getting ready to file for the petition to remove the conditions on a residency, which is in June 2002, they opened a joint bank account, and in January 2003, a brokerage account together. All of it does not add up. All of it adds up to Mr. Opong's version of events, rather than a bona fide marriage here, and an attempt to have a lifestyle together at the time of their marriage. If there's no other questions, I just request that the government request that the court deny the petition for review. Thank you. I'll give you a minute, Mr. Wilson. Wrap up. Thank you. I would say, Your Honor, the only thing I would add is that regarding Mr. Opong, in fact, there is no objective evidence that corroborates anything he was saying. The fact of the matter is he refers to a meeting that occurred sometime in 2000. During his phone interview with Officer Swera, he initially identifies the different meal than the one initially in his affidavit, then she corrects him as to which meal he was referring to where this occurred. So we have an issue. If this was in a normal state court proceeding, his testimony would be objectionable just on the fact that it's vague. He doesn't say anything, time, place, just some year in Minnesota, and there's no proof that he actually traveled here. In fact, he actually got out of his lawsuit when he was named as a defendant in the defamation case, or his own claim, because he didn't have personal jurisdiction here. He didn't have the necessary contacts, which then itself says, if you're arguing you have no contacts with Minnesota, then how are you here to actually witness the conversation you're talking about? So with that, Your Honor, I'll thank you for your time today. Thank you. Thank you, Counsel. The case has been well briefed and argued. I hope it's a coincidence and not something in the water. It's the second fraudulent marriage case I've had in the last few months, probably none ever before. Keep them away. I did. I just filed the opinion on a case called Oduya in the last week, and the law is consistent with the law as you briefed it, so I don't think it changes anything. You're all going to stay away from me. I think you're going to have to move to a different circuit now. Did I complete the argument? Yes, Your Honor. Very good.